The last case for argument this morning is, is it pronounced Grandoe Corporation very well versus Gander Mountain Company. Mr. Van Holt, good morning. You may proceed. Thank you, Your Honor, members of the court, Ms. Bachman. I'm Dudley Van Holt. I represent Gander Mountain Company. I am the appellant, but things get better from there. For example, I am advocating for the enforcement of the plain meeting of an agreement. I am advocating for the enforcement of a written agreement. I am advocating for the enforcement of an agreement with stipulated terms. And I am advocating for the enforcement of an agreement that comes later in time. So, to provide the detail, in 2009 to 2010, Gander Mountain, a retailer, bought almost a million dollars of gloves from Grandoe, a glove manufacturer. Is that to say that's a lot of gloves? That's a lot of gloves. Not as much as three million, go ahead. Not as many as three million. We sent purchase orders for the gloves. Grandoe accepted the purchase orders, shipped the gloves. We paid them about $950,000 for the gloves. The terms that controlled those purchase orders, that came with the purchase orders, were stipulated. And to give you a flavor, I'll just hit a few. There are many that I could go through that preclude Grandoe's case, but one of them, for example, says, Gander Mountain has no obligation to place other orders. This is after you've talked to them for how many months? Nine months? Met with them? Done PowerPoints? Even more than that, Your Honor, because we've had purchase orders and dealings in years past with them under the same terms. But I mean about this set of purchases and about this kind of gloves. That was November of 2008 that the parties started talking about those gloves. So before we have the vendor-buyer agreement, how many months is it, by your reckoning? Oh, six, seven, eight. Thank you. Proceed. So the purchase order terms agreed to by Grandoe said, Gander Mountain has no obligation to place orders with you. Gander Mountain can stop doing business with Vendor at any time, in its sole and absolute discretion, without cause. The purchase order terms also had an integration agreement. This is the entire agreement between the parties. And it also had a provision that says this supersedes all prior agreements, written or oral. Despite this and other terms that would preclude it, Grandoe sued because of an alleged oral agreement to send $3.1 million worth of purchase orders. Grandoe contends that a Gander Mountain buyer agreed in November 2008 that Gander Mountain would send $3.1 million worth of purchase orders for gloves. All right. So it's all precluded by the purchase order terms. You can escape written terms. You can get out of it in a lawsuit. But the way you do that is you allege fraud. You allege duress. You would allege mistake. You allege adhesion. How about estoppel? Maybe. Okay. Go ahead. You could argue that. I'm not sure whether it would apply to this particular agreement. I thought they pled that here, and that was submitted to the jury. Promissory estoppel? Yeah. Well, that doesn't work to get you out of a contract, because the existence of the contract precludes promissory estoppel. Oh, okay. I'm sorry. I'm on a different premise than you are. Go ahead. Okay. And Minnesota has a narrow reasonable expectations doctrine as well. You might have tried that. But they didn't try any of those. None of those were argued. Instead, what the court ruled during trial was the purchase order terms and conditions did not go back and wipe out the oral agreement because there was no consideration. The court said they already had an oral agreement for $3.1 million worth of gloves. Why would they have agreed to these purchase order terms? It doesn't make any sense. Okay. The judge later conceded he was wrong about that in his post-trial motion. He conceded, okay, consideration isn't really a requirement, even if you assume that there was the oral agreement. But he said then, in his post-trial ruling, the jury was free to find that Grandot did not agree that the vendor terms, the purchase order terms, were the entire agreement between the parties. Well, the trouble with that is, number one, the judge has ruled against me as a matter of law on that already. He had said, I've ruled that the purchase order terms can't wipe out the oral agreement. You are precluded from arguing that to the jury. Don't do it. And he said it more than once. In addition, whether a written contract is integrated or not is a legal question. It's simply not an issue for the jury. And in this case, the jury wasn't even instructed about it. So I'd say the idea that the jury was free to find that this was not the entire agreement is just incorrect. It's inapplicable. Now, Counselor, you say when they got almost $10,000 of the gloves on the first purchase, that was the whole deal. And that was the whole agreement. It wipes out anything done before then and controls anything after then. That was the terms of the agreement, Your Honor. If they'd bought one pair of shoes. I think it was. Or one pair of gloves. I'm sorry. If they bought one pair of gloves, that'd done it. Go ahead. I think it is better to look at it in the context of the true facts, which is we bought $950,000 worth of gloves. But you're essentially making a consideration argument. You know, you're essentially getting back to, how much is enough? Well, fortunately, I don't think our facts present that, because $950,000 is plenty. But yeah, I would say the first order, if it was $6,000, $9,000, whatever it was, if the parties agreed, this is our entire agreement, then they agreed to that. Now, Grando's executives said, we never read terms of those things. We never read those. Their defense is essentially, you know, kind of a subjective state of mind, we're free of contract terms because we never read them. Yeah, but not promissory estoppel, though. On promissory estoppel, they're saying there was enough evidence, you made a promise, you induced reliance. You know the drill. You know the drill. Why doesn't promissory estoppel save them? Because there's a contract. The law is clear that if there is a contract governing the parties' relations, you cannot assert promissory estoppel, it doesn't apply. Here we have a contract that says, this is the entire agreement. We have no obligation to place orders. How could we be more clear? I mean, the in-house counsel who wrote this is in the audience. I'm sure he would be interested. How could he have written this better to have precluded? And if you read the terms and conditions that are attached to the appendix of the brief, you'll see throughout, one of the principal purposes is to preclude a vendor from coming in and saying, we had some deal, there was some side deal, there was some this deal or that deal. It says, we only deal through written purchase orders. That's it. That's the only way we do business. And we don't have any- They didn't send you back a set of forms, you know, the old battle of the forms. They didn't send you back a set of their MND forms. That would be a better case for them. No, they didn't do that. That'd be a heck of a case. That'd be a better case. We'd be talking about 2207. But that didn't happen. We have purchase order terms and conditions that were accepted by shipment under 2206. So you've got the contract. That's it. The terms are undisputed. And they preclude the oral agreement. So Grandot, so I've talked about with a court's argument as to why, or the court's findings in its post-trial order as to why the vendor buying agreement shouldn't be enforced. Grandot has different arguments in their brief on appeal. Grandot argues, number one, you can't retroactively apply the vendor buying agreement. Okay. Now, if you think that through, retroactivity isn't even involved here. The vendor buying agreement arose when they shipped gloves in response to our first June 2009 purchase order and all the subsequent purchase orders. Okay. Does it matter that these are unique goods? We kind of danced around the UCC edge. Yes. UCC has a lot of different rules on specific identifiable goods. Yes. Talk about that. The big effect of that is statute of frauds doesn't apply. So that is the most significant impact of that. In addition, there's a provision of the UCC that says when you have such specifically identifiable goods, they can use the damages theory that they used, which is what they have sitting in their warehouse with the Gander Mountain trademarks, they can recover for that. So those are the principal impact of that. In addition to the retroactivity point, which I don't think is applicable because as of right now or, you know, as of June of 2009, the terms were we have no obligation to place more orders with you. We can cancel any time. We can terminate. We can, you know, all those provisions were in effect as of June 2009. There's nothing retroactive about it. The second thing they argue is that we waived, Gander Mountain waived the buying agreement by the oral agreement. But that kind of has the cart and the horse in the wrong order there because the oral agreement supposedly occurred in 2008. And then the vendor agreement with the purchase order terms occurs in the summer of 2009. So oral statements in 2008 don't waive an agreement that both parties agreed to in 2009. That just doesn't work. The third argument they have is that there was a written approval to vary the vendor buying agreement. And what they're referring to there is an email from the buyer. The Gander Mountain buyer sent an email in the course of getting this system set up to send purchase orders. The Gander Mountain buyer sent an email to an independent sales rep for Grando that said, please put into this spreadsheet all of the forecasted quantities that we committed to. Okay, sounds good for them. Committed. The forecast word doesn't work so well for them. But committed. Enter into this, you know, the numbers that we forecast and committed to. All right. So that doesn't constitute an amendment or a waiver of an agreement that you then enter into months later. The agreement Gander Mountain is seeking to enforce is the last thing that happened. Those are the terms that get enforced. So you can't, and if you look at the email, it's part of the record, you know, it's not as though it refers to the buying agreement and says we're intending prospectively to waive something we're going to agree to in a few months. It doesn't come close to saying that. So it doesn't work as a matter of logic. It doesn't work as a matter of the terms of that email. It simply does not constitute any sort of a written approval to vary the terms of the buying agreement. So, at the end of the day, what Gander Mountain is seeking to have the court enforce is the plain meaning of the written agreement stipulated to by the parties that was the final agreement in their business relations. That under Minnesota law should be a fairly easy case. And I will skip the parole evidence rule arguments because I don't think it's necessary to even reach that point. And unless the court has questions, I will reserve the balance of my time. Very well. Ms. Bachman. Good morning. May it please the court, counsel? You may proceed, yes. My name is Ms. Bachman. I'm with the law firm of Foley and Mansfield and I do represent the Grand Ole Corporation. In this appeal, Gander Mountain is essentially asking this court for three things. They're asking this court to ignore well-established contractual law. They're asking this court to make an exception for their failure to follow procedural rules. And they're asking this court to completely disregard the overwhelming evidence that supported the jury verdict for the trial in this matter. Throughout this case, this has become a common theme for Gander Mountain. That there are two sets of rules. There's a set of rules that applies to Gander Mountain. And then there's a set of rules that they can twist and turn and contort to apply to vendors when it's convenient for Gander Mountain. And that's precisely what happened in this case. Did you agree to the vendor buying agreement? Your client, I mean. But did your client agree to the vendor buying agreement? There was no intent that that would become the entire contract for what we're talking about. For this transaction. As to the $9,900 first order? Absolutely. You agreed to it as to that? Yes, Your Honor. We will not dispute that at all. Does it come with each time you make a purchase, do you get one of these? See, this is the question. What does the record reflect? The record reflects that the vendor buying manual, or VBA, was actually sent to all vendors in an email blast in 2007. And it wasn't actually the vendor buying manual. It was a link to the manual. And Gander Mountain says, if you want to do business with us, these are the terms and conditions. And you have to click on the link and read it. Maybe, maybe not. The testimony from my clients was that they did not read it. And the custom and use or standard in the industry is they're well aware that there are these vendor manuals, but they look to them for specifications regarding shipping details, things of that nature, how things should be packaged and whatnot. I go back to the timing of this, and this is very important. The first purchase order wasn't issued for the private label glove transaction until June of 2009. That was seven months after the initial meeting and the agreement that was reached for the manufacture of private label gloves. Seven months. By that time, the cake was baked. Counsel, for some reason, I thought the vendor buying agreement came with the first purchase. Now, tell me if I don't understand that. I think what Gander Mountain has argued is that there had been some previous dealings between the parties not involving a private label transaction. In other words, my client had manufactured, I think it was probably slippers or gloves, but under their own label. And in that instance, I think they were trying initially to argue that once that initial transaction occurred, that Grando was forever agreeing to the terms and conditions of anything that would happen from here until eternity. That was the first argument they tried to assert. But in terms of whether or not there's specific language that goes with the purchase order to say, when you accept this purchase order, you've now agreed to the terms and conditions, it's not in the purchase order. It's in the VBA. The VBA says the agreement becomes the entire agreement because you've got the purchase orders, you've got the resource allocation contract, and they reference other documents. But here's another important distinction I think that needs to not be overlooked. The cases that Gander Mountain cites in support of this theory that we have a written agreement that governs the terms and conditions of this entire transaction, the cases that Gander Mountain cites in favor of that or in support of that premise all involve actual written contracts that are signed by the parties. We don't have that in this case. There's never been anything that was signed by Gander Mountain or Grando. How long have they been doing business together? How many years? That's a good question, Your Honor. I would say it was before 2007, but really we're talking about the VBA terms from 2007, that initial email blast that went out with the link. The trial, was there no reference to how long they'd been doing business? No, the only reference was just the earlier transaction in 2007. But again, the distinction there is we're talking about Grando-labeled goods, not Gander Mountain-labeled goods that my client is now stuck with and cannot sell. That's the difference. And there's the evidence they can't be sold at all anywhere in the world? There was testimony from Rick McCabe, who is no longer with Gander Mountain, but he had testified that he believed my clients would be able to sell them in South America, that there would be no restrictions in South America. The jury verdict believed that a little bit, right? Because you didn't get all the money you asked for? No, we did. Did the jury believe that a little bit? No, Your Honor. We did get all the money we asked for. You sure? Yes. I thought you didn't. Go ahead. No, we did receive all the money that we asked for. And the money that we asked for was actually the value of the gloves, or the price of the gloves that were left. There were some gloves that they were able to, once Grando found out there was a dispute or an issue, they were able to stop production. They were able to either stop production, there were some shortfalls in the production, and then there was also the ability for some of the gloves to be relabeled so that they could be sold without infringing upon Gander Mountain's logo. But I think it's important to go back to this idea of what the court looks to when determining whether or not this agreement was the integrated written agreement governing this transaction. What was the effect of your stipulation that the VBA became a part of each transaction when Gander Mountain issued purchase orders that you accepted? Well, we don't dispute that to the extent that those purchase orders were issued, that becomes a part of the contract, which leads us actually to the next issue, which is we believe there was a contract for not just the $950,000, but actually the $3 million. And that's why the promissory estoppel claim was appropriate and why it was appropriately submitted to the jury. If Gander Mountain is taking the position there was one contract and it was the contract for which we issued the purchase orders, then there is no contract as to the other gloves, and so that was appropriately submitted to the jury for their consideration on whether or not Grando had a promissory estoppel claim. And the overwhelming evidence supported the fact that Grando did, in fact, have a claim for promissory estoppel. They took several steps in reliance upon the promise that the Gander Mountain buyer made when she went through each individual item line by line during that meeting in November. There were two meetings in November. The first one was to talk about the in-line and early season production, and the buyer knew that in order to get the discounted early season pricing, she was also having to make a commitment to purchase the in-line as well, which was at a regular price. So the parties went through line by line and decided how many gloves, what type of glove, what type of fabric she would want, what type of buckle, where she would want the clasps, where she would want the logos. All of these things were decided at the end of those meetings on November 2008. And my clients went back to work and started ordering raw materials, started holding weekly conference calls with the buyer to discuss everything. You know, how does this logo look? This is how we've done it. And all this time, the buyer is saying, purchase orders are coming. We'll be issuing the purchase orders. We're committed to this program. And the other thing that Gander Mountain wants this court to adopt is that when Gander Mountain uses a word like committed over and over again, that it doesn't really mean that. Commitment doesn't mean that. Does it say forecast in the same sentence? Forecast that we committed to. Right. And the buyer had the opportunity to review that information once it was entered into the item setup form, and she never objected. She never said, no, that's not what I meant. She met with the vice president of sales at the outdoor retail show in January of 2009. This was five months before the first purchase order was issued, and she again reassured the vice president of sales, we are committed to these programs. And it was based on everything that Gander Mountain did, all of the actions, all it did was reaffirm the agreement that they had reached in November of 2008. The buyer also made sure that the Gander Mountain logo and the permission to use the Gander Mountain logo was provided to Grando. That's another sign or indication that they've reached an agreement. They had an agreement, and both parties were acting as if there was an agreement. Here's another issue that's really important too. When the dispute finally came to light, again, this is two months before the first purchase order is issued, so roughly April 15, 2009. When that dispute came to light, the email from the buyer indicated, we had to cut some of the styles. We had to cut some of the quantities or styles. That's an indication that she was well aware of the fact that she had agreed to all the quantities and styles that the parties had discussed and reached an agreement on in November of 2008. Looking at all of those factors, the court made a determination that there was a fact issue as to whether or not Grando had in fact intended to be bound by the terms and conditions of the VBA when it accepted a purchase order for $9,000 worth of gloves in 2009, seven months after the parties had initially reached an agreement. And that was why the court determined that it was appropriate to submit that issue to the jury. Now, there are a couple of other items I just want to quickly bring up with respect to the failure of Gander Mountain to follow the appropriate procedure. The Rule 50A motion that Gander Mountain submitted at the time of the trial focused on the fact that there was insufficient evidence of a contractual offer, that there was insufficient evidence of acceptance of the offer, that the acceptance of the purchase order meant Grando agreed that Gander Mountain was under no obligation to issue further purchase orders. And the final point that they made at the 50A was that the buyer had no authority to enter the $3 million contract for private label gloves. What was missing from the 50A motion was that the parole evidence rule prohibited any evidence of the oral agreement. That was never presented to the court. What is also missing is... I didn't say never. I thought the judge had already kind of ruled on that issue. You know, that's the reason they said they didn't put it in there. Well, they never made the motion, Your Honor. What the Gander Mountain counsel wanted to argue was that the VBA... that the acceptance of the purchase orders meant that they were no longer obligated to purchase anything else. But that is not quite the same as saying the terms of the VBA, the merger terms, prohibit any evidence of this oral agreement. It's a fine distinction, but it is there. So my point is they failed to follow the proper procedure, and for that reason they may have waived some of these arguments that they are now insisting are necessary in this case for the court to overturn the jury award or the jury verdict, especially with respect to the contractual issue. The same argument is also true in terms of the procedural issue for the promissory estoppel claim. That, again, was not something where they were seeking a motion for entry of judgment on that issue. They never raised that. So the promissory estoppel claim, again, they have waived that issue in terms of whether or not that was appropriately submitted to the court. A couple of final points that I think are worth noting, and, again, this goes back to the record, and this is evidence that the court heard and that was also submitted to the jury. The buyer admitted that as early as February, or actually January of 2009, that she was still talking with other vendors, but she never bothered to let Grando know about that. She also admitted that she was trying to get the best price possible, and she never let Grando know that either. In other words, she hid some of these facts from Grando, leading Grando to believe that they had an agreement to manufacture these gloves. But at the same time, she's trying to get the best deal possible. It's not appropriate to allow, under those circumstances, with respect to the promissory estoppel claim, it's not appropriate to allow Gander Mountain out of this deal. It's not appropriate for them to say, look, we issued a purchase order in June of 2009, Grando accepted it, Grando is stuck holding the bag for the remaining inventory that we thought we liked, but we decided we'd get a better price somewhere else. That's not appropriate. Based on those arguments, Your Honors, we would respectfully request that this court affirm the judgment from the district court. Thank you. Your Honors, I'll try to hit some of the issues that came up. With respect to the vendor buying agreement, where is it? How does it get to the vendor? Since the party stipulated that it governed the purchases here, a lot of the evidence on that didn't get into the record. I think that was wise on Ms. Bachman's part to stipulate to that because there's a bunch of evidence on that that we would have presented that we didn't get into the record. So what I have to do is say, we stipulated. I'd love to tell you about more, but we stipulated. So, number two, Grando does not read the VBA, she said. Well, that's what they said, that's true. Although at trial, interestingly, the president, who was involved in the sales pitch, said actually the COO is responsible for reading such things and making sure we comply. Okay, well, this was the first time anybody had ever heard of that. The COO was not named in discovery, nobody called him, he wasn't available, you know. So all of that detail is interesting, but ultimately irrelevant because not reading an agreement that you entered into is no defense at all. First purchase order was June of 2009. I think the significance of that was that she was making, well, I don't recall the significance of that. We first started to send purchase orders in April, which was plenty of time for them to go manufacture them in China and send them over here. That was when we found out that they had already started manufacturing them. And at that time, as a matter of fact, they had a meeting at Gander Mountain's offices, and Gander Mountain's buyer said, look at the terms. It says we're not obligated. And they agreed their president's testimony, or maybe it was their vice president of sales testimony, said she pointed to where it says you've got a right to cancel. It was right there. Okay, the purchase orders and the agreements came after that. It was specifically drawn to their attention, and they accepted the purchase orders. So what then, again, I'm sure you covered this in your opening argument, the effect of what was her name, Jeanne Hall, or Jeanne Hall's representations and promises are as nothing? Well, you know, sometimes when we're trying to just discuss legal issues, we stay away from the facts. But let me give you just a brief picture. Okay, you'll have a minute to give me that. I shouldn't have asked you late in the argument. When big companies, retailers, are buying things, they don't just send out a purchase order, boom, out of the blue. You have this long period of negotiation. You've got to negotiate what the product's going to be. You've got to negotiate terms. You've got to negotiate prices. And when you do that, you talk about numbers. You talk about quantities. If we could buy 10,000, what would be the price? If we could buy 100,000, what would it be? You come up with a price list. All those conversations occurred in the course of those discussions. I see that I'm out of time, so I won't address any other points. Thank you for hearing this matter, and we ask that you reverse the judgment below. Thank you. Very well. The case is submitted. We will take it under consideration. Madam Clerk, does anyone have any questions?